ALEXIS S. GUTIERREZ, ESQ. (Bar No. 190487)
agutierrez@higgslaw.com
JOHN MORRIS, ESQ. (Bar No. 99075)
jmmorris@higgslaw.com
HIGGS FLETCHER & MACK LLP
401 West "A" Street, Suite 2600
San Diego, CA 92101-7913
TEL: 619.236.1551
FAX: 619.696.1410

Attorneys for Plaintiff/Relator
ROGER B. SCHAGRIN

UNDER SEAL

FILED
APR 12 2017
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

ROGER B. SCHAGRIN, an individual, for himself, and on behalf of the United States of America,

Plaintiff,

v.

NEXTracker, Inc., a California Corporation,

Defendant.

Case No.: CV17 2048 JSC

**COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT**

[31 U.S.C § 3729, et seq.]

[FIILED UNDER SEAL
(31 U.S.C. § 3730(b)(2))]

**JURY TRIAL DEMANDED**

RELATOR, ROGER B. SCHAGRIN ("Relator"), brings this *qui tam* action, individually and in the name of the government of the United States of America (the "United States"), by and through his undersigned attorneys, Alexis S. Gutierrez, Esquire, and John Morris, Esquire, and alleges as follows:

### INTRODUCTION

1. This is an action by *qui tam* Relator, in his name and in the name of the United States, against NEXTracker, Inc. ("NEXTracker"). The case seeks to recover damages and penalties arising from NEXTracker's knowing failure to accurately designate about 73,000 metric tons of Circular Welded Carbon Quality

Steel Pipe ("Circular Welded Pipe") it imported from the People's Republic of China ("China") as subject to certain Antidumping and Countervailing duties set by the U.S. Department of Commerce (the "Department of Commerce") and specifically applicable to that Circular Welded Pipe.

2.  NEXTracker's false designations between June of 2014 and February of 2017 resulted in the non-payment of about $100 million in applicable duties. NEXTracker's false designations also afforded Chinese steel manufacturers a substantial but improper advantage over domestic steel manufacturers in the United States.

3.  Relator brings this action against NEXTracker pursuant to the federal False Claims Act, 31 U.S.C. section 3729, *et seq.* (the "False Claims Act").

4.  Relator seeks treble damages, civil penalties, declaratory relief, injunctive relief, and such other relief as is available under the False Claims Act. Relator also demands a trial by jury for all claims for which the right to a jury trial is authorized.

## PARTIES

5.  Relator is a citizen of the United States, and is a permanent resident of Florida.

6.  NEXTracker is a California Corporation (registration no. C3613515), with its corporate headquarters located at 6200 Paseo Padre Parkway, Fremont, California 94555.

## JURISDICTION AND VENUE

7.  This Court has jurisdiction under 28 U.S.C. sections 1331 and 1345; and under 31 U.S.C. sections 3730 and 3732.

8.  Venue is proper in this district pursuant to 31 U.S.C. section 3732(a), because NEXTracker transacts business in this district and has committed in this district numerous acts proscribed by the False Claims Act.

## STANDING

9. Both the United States Attorney General and private persons may bring a civil action under the False Claims Act.

## APPLICABLE LAW

**A. The False Claims Act.**

10. Liability under the False Claims Act attaches to any person who knowingly presents, or causes to be presented, a false claim for payment, or presents, or causes to be presented, a false record or statement in order to have such false or fraudulent claim paid by the United States.

11. Liability under the False Claims Acts arises in two related contexts, one referred to simply as a "False Claim," the other referred to as a "Reverse False Claim." A False Claim is defined at 31 U.S.C. section 3729, subdivision (a)(1)(B) as follows:

> Any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government . . . .

12. A "Reverse False Claim" is defined at 31 U.S.C. section 3729, subdivision (a)(1)(G), as follows:

> [A]ny person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government . . . .

13. Under the False Claims Act, 31 U.S.C. section 3729, subdivision (b)(1)(A), "knowing" and "knowingly" mean that a person, with respect to information:

> (i)   has actual knowledge of the information;
> 
> (ii)  acts in deliberate ignorance of the truth or falsity of the information; or

    (iii) acts in reckless disregard of the truth or falsity of the information . . . .

14. Under the False Claims Act, 31 U.S.C. section 3729, subdivision (b)(1)(B), a false claim "requires no proof of specific intent to defraud."

**B.** **The Law Regarding Importation of Goods into the United States.**

15. All goods imported into the United States are subject to either "duty" or "duty-free" entry in accordance with the "classification" of the goods in question as derived from the Harmonized Tariff Schedule of the United States (the "Harmonized Tariff Schedule"), which includes over 17,000 unique classification codes for various goods depending on their name, use, and the materials used in their construction.

16. The ordinary import duty, if any, imposed on any given good is levied at the time of import, and is pre-determined according to the "classification code" indicated in the Harmonized Tariff Schedule. That duty is intended to be enforced by the agency of the government now known as U.S. Customs and Border Protection ("U.S. Customs") according to the classification code of the good as well as the country of its origin.

17. Importers of record must provide a complete, accurate description of their goods to U.S. Customs, must provide the correct product description and designation for their goods, and must exercise reasonable care when classifying and appraising their goods. Once self-designated, the applicable duty is required to be paid by the importer of record.

## ALLEGATIONS

**A.** **The Anti-Competitive Impacts of "Dumping" and Foreign Subsidies.**

18. Antidumping and Countervailing duties are specialized duties required—in addition to ordinary import duties—through extensive administrative processes designed to provide trade relief to industries in the United States harmed by less-than-fair value and subsidized imports, respectively.

19.     Such less-than-fair-value imports are the result of predatory pricing ("dumping") by foreign companies (typically to increase market share, or to drive out competition). Such subsidized imports are the result of state sponsorship ("subsidies") by foreign countries (typically to boost production, or to help establish a monopoly for that country). In either circumstance, the result is that the less-than-fair-value imports, or subsidized imports, cause or threaten to cause material injury to a domestic industry in the importing country.

20.     In an effort to remedy the anti-competitive effects of foreign manufacturers who dump their product in the United States, the Department of Commerce imposes "Antidumping duties" upon such goods in amounts generally equal to the amount by which the normal value exceeds the export price of the goods for all relevant entries of those particular goods. To remedy the anti-competitive effects of foreign subsidies, the Department of Commerce also imposes "Countervailing duties" on such subsidized goods in amounts generally equal to the subsidization for all relevant entries of those particular goods. In other words, Antidumping and Countervailing duties are designed to "level the playing field" for domestic manufacturers for those same goods.

21.     However, the *evasion* of such Antidumping and Countervailing duties is a serious problem for the United States, costing the country millions of dollars in lost revenue and seriously harming United States manufacturers in the process. To illustrate, in 2016, The United States General Accountability Office concluded that the United States was owed an estimated $2.3 billion in Antidumping and Countervailing duties relating to goods imported into the United States between 2001 and 2014 alone (and 95% of that from China).

///
///
///
///

### B. Antidumping and Countervailing Duties Are Enacted to Remedy the Imbalance.

22. Problems with dumping and state-sponsored subsidies related to Circular Welded Pipe from China have long been the source of significant, documented injury, and thus the cause of critical lost revenue to the United States, plus substantial hardships to the United States steel industry, where domestic producers are unable to compete with the low prices offered by their Chinese competitors.

23. In 2007, in response to those problems, a consortium of domestic steel industry participants petitioned the U.S. International Trade Commission (the "ITC") and Department of Commerce to address the unfair competition posed by imports of Circular Welded Pipe from China.

24. The ITC and Department of Commerce investigated and validated the concerns raised. Through Antidumping and Countervailing duty orders issued by the Department of Commerce in July 2008, U.S. Customs requires importers of Circular Welded Pipe from China to post cash deposits for anticipated Antidumping and Countervailing duty liability.

25. The "scope" of the Antidumping and Countervailing duty orders determine what products they cover. Specifically, the orders with respect to Circular Welded Pipe from China contemplate steel pipe—generally known as "standard pipe" and "structural pipe" (but also referred to as "circular," "structural," or "mechanical tubing")—made of carbon steel and having an outside diameter of 0.372 inches to 16 inches. The scope of the relevant orders covers a broad range of Circular Welded Pipe "whether or not stenciled, regardless of wall thickness, surface finish (e.g., plain end, beveled end, grooved, threaded, or threaded and coupled), or industry specifications . . . ."

///

///

26. The scope of the Antidumping and Countervailing duty orders indicated above covers *all* types of Circular Welded Pipe from China within the specified alloy and outer diameter range, except for seven expressly-identified exclusions. Specifically, those exclusions cover pipe suitable for use in boilers, mechanical tubing, finished electrical conduit, finished scaffolding, tube for redrawing, oil country tubular goods produced to particular specifications established by the American Petroleum Institute, and line pipe produced to American Petroleum Institute specifications.

27. As a means of enforcing those Antidumping and Countervailing duty orders, U.S. Customs requires all importers of steel from China to make cash deposits equal to the specific Antidumping duty and Countervailing duty rates listed for such products by the Department of Commerce.

28. The *actual* amounts owed are calculated later, after the Department of Commerce completes its annual "administrative reviews." In fact, in the case of Circular Welded Pipe from China, the Department of Commerce has not completed any such reviews, the upshot of which is that the cash deposit rates automatically become the *actual* duty rates.

29. Those Antidumping and Countervailing duty orders are a vital counter-balance to the unfair trade practices from China that threaten, and that may yet cripple, the steel industry in the United States.

C. **The Antidumping and Countervailing Duties Imposed on Imports of Circular Welded Pipe from China.**

30. The 2008 Antidumping and Countervailing duty orders established precise duty rates; but, in response to litigation at the World Trade Organization and the U.S. Court of International Trade, the Department of Commerce subsequently revised the Antidumping and Countervailing duty rates for U.S. Customs to collect on Circular Welded Pipe imported from China.

///

31. Specifically, the Department of Commerce established two Antidumping duty rates for Circular Welded Pipe from China: one of them applicable to specific, identified exporters and producers; and another, "China-wide" rate, for unidentified producers and exporters of Circular Welded Pipe. The Department of Commerce further established four Countervailing duty rates for Circular Welded Pipe from China: three of them applicable to specific, identified exporters and producers, and another, "all others" rate, for unidentified producers and exporters of Circular Welded Pipe.

32. The "shipper" indicated by NEXTracker for the Circular Welded Pipe it imported from China was Suzhou Baojia New Energy ("Suzhou Baojia"). Suzhou Baojia was never assigned a specific Antidumping or Countervailing duty rate by the Department of Commerce. Therefore, the Circular Welded Pipe imported by NEXTracker is subject to the China-wide Antidumping duty rate and the "all others" Countervailing duty rate.

33. The specific "all others" Countervailing duty rate applicable to Circular Welded Pipe imported from China in 39.01 percent. In this case, that Countervailing duty rate is "additive" to the China-wide Antidumping duty rate applicable to Circular Welded imported from China of 85.55 percent, for a combined total duty rate of 124.56%. Those rates remain in effect for Circular Welded Pipe imported from China.

D. **NEXTracker's Goods Were Subject to Those Antidumping and Countervailing Duties.**

34. Relator is informed and believes, and thereon alleges—and public records confirm—that, since May of 2014 through February 2017, NEXTracker was the importer of record for 771 separate "shipments" (meaning entry lines on ship manifests) of Circular Welded Pipe from China. The quantity per shipment imported into the United States ranged widely from 0.3 to over 173 metric tons,

but totaled approximately 73,000 metric tons imported in a period of less than three years. Relator is informed and believes, and thereon alleges, that those imports of Circular Welded Pipe are ongoing and continuing, and Relator intends this Complaint to subsume those continuing violations of the False Claims Act.

35. Relator is informed and believes, and thereon alleges—and public records confirm—that the goods at issue were sourced from China, through the port of Shanghai, from Chinese exporter Suzhou Baojia, and that those shipments entered the United States primarily through the ports of Los Angeles and Long Beach, California (the nearest points of entry to NEXTracker's location in Fremont, California).

36. Relator is informed and believes, and thereon alleges, that NEXTracker imported these goods using Harmonized Tariff Schedule classification subheadings for Circular Welded Pipe subject to the Antidumping and Countervailing duty orders. Still, however, Relator is informed and believes, and thereon alleges, that NEXTracker knowingly, but falsely, designated its imported goods as "non-subject" to the applicable Antidumping and Countervailing duty orders, thereby importing the goods without payment of the requisite cash deposits that became the eventual duty amounts owed.

37. Relator is aware of no basis upon which the Circular Welded Pipe imported by NEXTracker could be excluded from the Antidumping and Countervailing duty orders described above. Specifically, Relator is informed and believes, and thereon alleges, that the modifications made to the Circular Welded Pipe NEXTracker imported do not exempt the imports from the Antidumping and Countervailing duties discussed above. For instance, while the imported goods may have been "swaged" (narrowed at its ends), the scope of the relevant Antidumping and Countervailing duty orders specifically covers Circular Welded Pipe from China "regardless of . . . end finish." And, while the imported goods may be distinguished by certain "perforations" (uniformly drilled holes), the

Department of Commerce has specifically ruled in a closely analogous context that punching holes in steel pipe does not take it outside the scope of orders such as the Antidumping and Countervailing duty orders applicable here.

38. Relator is informed and believes, and thereon alleges, that the Circular Welded Pipe imported by NEXTracker is not eligible for any of the seven exclusions to the Antidumping and Countervailing duty orders discussed above. Specifically, NEXTracker's Circular Welded Pipe is not suitable for use in boilers, mechanical tubing, finished electrical conduit, finished scaffolding, tube for redrawing, oil country tubular goods produced to particular specifications established by the American Petroleum Institute, or line pipe produced to American Petroleum Institute specifications.

E. **NEXTracker Avoided Paying About $100 Million in Antidumping and Countervailing Duties**

39. Relator is informed and believes, and thereon alleges, that from 2014 through February 2017, NEXTracker imported approximately 73,000 metric tons of Circular Welded Pipe, all of it "dutiable goods," in 771 separate shipments from China.

40. Relator is informed and believes, and thereon alleges, that the sworn statements NEXTracker made on official import documents in connection with each of those 771 shipments mis-designated its goods as *non-subject* to the Antidumping and Countervailing orders described above.

41. Relator is informed and believes, and thereon alleges, that the Circular Welded Pipe NEXTracker imported—had it been properly designated—would all have been subject to cash deposit rates in an aggregated amount of 124.56 percent (as explained at paragraph 33, above).

42. The actual value of NEXTracker's Circular Welded Pipe is proprietary and not publicly available. However, public import data maintained by the ITC establishes that, for calendar year 2016, the Average Unit Value for *all*

imports of Circular Welded Pipe from China was $1,136 per metric ton (on a weight basis average). Comparing that public import data with publicly-available ship manifest information further establishes that, for calendar year 2016, NEXTracker imported *ninety percent* of all imports from China using Harmonized Tariff Schedule classification subheadings for Circular Welded Pipe subject to the Antidumping and Countervailing duty order (with the two volumes moving in precise tandem throughout the year). Therefore, until discovery perhaps reveals differently, Relator reasonably uses that $1,136 Average Unit Value for Circular Welded Pipe from China as a "proxy" for the actual value of NEXTracker's Circular Welded Pipe.

43. Relator is informed and believes, and thereon alleges, that NEXTracker did not make the required cash deposits consistent with the calculations above, and that U.S. Customs has not collected those applicable Antidumping or Countervailing duties.

44. Relator is informed and believes, and thereon alleges, that the Antidumping and Countervailing duties NEXTracker owed—but did not pay—can be accurately estimated as the 2016 Average Unit Value for all Circular Welded Pipe from China ($1,136) *times* the combined Antidumping and Countervailing duty cash deposit requirements for this Circular Welded Pipe (124.56%), *times* the volume of Circular Welded Pipe imported by NEXTracker (approximately 73,000 metric tons).

45. On that basis, Relator is informed and believes, and thereon alleges, that NEXTracker unlawfully avoided paying about $100 million in Antidumping and Countervailing duties, thereby depriving the United States of lawful proceeds in that amount and depriving the U.S. Circular Welded Pipe industry of necessary trade relief.

///
///

### F. Relator's Futile Efforts to Compel NEXTracker's Payment of Owed Antidumping and Countervailing Duties

46. In September of 2016, Relator, on behalf of U.S. Circular Welded Pipe manufacturer, Wheatland Tube Company ("Wheatland"), filed with U.S. Customs the first-ever allegation under the Enforce and Protect Act of 2015 (Pub. L. 114-125) (the "EAPA"), which was enacted to create a transparent process for U.S. Customs to investigate allegations of Antidumping and Countervailing duty evasion.

47. Because current EAPA regulations lack protection for proprietary information, the information filed with U.S. Customs in support of the EAPA allegations did not include highly relevant but sensitive information—including photographs of the specific pipe imported by NEXTracker that confirm its nature as Circular Welded Pipe—that compels the conclusion that NEXTracker has violated the False Claims Act here.

48. In October of 2016, U.S. Customs declined to initiate an EAPA investigation, stating that Wheatland had not *proven* that NEXTracker's Circular Welded Pipe entered the United States fraudulently. Relator believes U.S. Customs misapplied the *standard* applicable for initiating an EAPA investigation, since the *proof* of NEXTracker's fraud—the sworn declarations provided to U.S. Customs—is not publicly available.

49. Still intending both to assist in the recovery of duties properly owed to the United States, and to protect the interests of United States steel manufacturers generally, Relator has filed an "e-Allegation" with U.S. Customs, hoping to spark its further interest in investigating these allegations. However, with no confidence—and certainly no *certainty*—U.S. Customs will pursue this matter independently, Relator now initiates this False Claims Act case, where discovery will reveal and confirm the truth of these allegations, where the United States can recover treble the amount of the duties evaded, and where substantial

civil penalties can be imposed as a means of punishing NEXTracker for its long history of false claims.

## COUNT I

### (Against NEXTracker)

**Violations of the False Claims Act [31 USC § 3729(a)(1)(B) & (G)]**

50. Relator hereby incorporates paragraphs 1-49 above as if fully set forth herein.

51. As described in this *qui tam* Complaint, NEXTracker, by and through its officers, agents, and employees:

    a.    knowingly presented, or caused to be presented, to the United States a false or fraudulent claim for payment or approval;

    b.    knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States; and

    c.    knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

52. NEXTracker authorized and ratified all the violations of the False Claims Act committed by its various officers, agents, and employees.

53. The government of the United States, and the general public of the United States, have been damaged as a result of NEXTracker's violations of the False Claims Act.

54. Relator requests a jury trial on all issues so triable.

## COUNT II

### (Against NEXTracker)

**Injunctive and Declaratory Relief**

55. Relator hereby incorporates paragraphs 1-54 above as if fully set forth herein.

///

56. There exists an actual controversy between the United States and NEXTracker.

57. Relator, individually, and on behalf of the United States and California, requests the following equitable relief:

    a.    that a judicial determination and declaration be made of the rights of the United States, and the corresponding responsibilities of NEXTracker;

    b.    that NEXTracker be ordered to cease its unlawful practice of violating the federal False Claims Act, 31 U.S.C. section 3729, et seq.; and

    c.    that any further equitable relief that this Court deems just be afforded the federal government.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against NEXTracker, and for relief as follows:

A.    that NEXTracker be ordered to cease and desist from violating the False Claims Act;

B.    that this Court enter judgment against NEXTracker:

    1.    in an amount equal to three times the amount of damages the United States has sustained because of NEXTracker's actions pursuant to the False Claims Act; and

    2.    plus a civil penalty consistent with the provisions of 31 U.S.C. section 3279, subd. (a)(1)(G) (that is "not less than $5,000, and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990," which presently calculates to not less than $10,781 and not more than $21,562 for each violation).

C.    that Relator be awarded the maximum amount allowed pursuant to section 3730(d) of the False Claims Act;

D.    that Relator be awarded all costs of this action, including attorneys' fees and expenses pursuant to 31 U.S.C. section 3730, and 31 U.S.C. section 3730(d)(1)-(2);

E.  for interest; and

F.  for such other and further relief as this Court deems just.

### JURY DEMAND

**RELATOR DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted, for the Relator.

DATED: April 12, 2017                    HIGGS FLETCHER & MACK LLP

By: *Alexis S. Gutierrez*
ALEXIS S. GUTIERREZ, ESQ.
JOHN M. MORRIS, ESQ.
Attorneys for Plaintiff/Relator
ROGER B. SCHAGRIN

7900885.1